In the Matter of a Proposal or Plan by MORTGAGE COMMISSION OF THE STATE OF NEW YORK to Exercise Certain of its Limited Powers with Respect to a Mortgage Covering Premises Known as 170 Second Avenue, Borough of Manhattan, City, County and State of New York, Securing Investments Issued and Guaranteed by NEW YORK TITLE AND MORTGAGE COMPANY and Designated as Series N-84.

Supreme Court, Additional Special Term, New York County, June 24, 1937.

*Maurice Finkelstein* [*Henry Weiner* of counsel], for the Mortgage Commission of the State of New York.

*William A. Shea* [*N. Milham* of counsel], for the New York Title and Mortgage Company in liquidation.

*Guggenheimer, Strasser & Meyer* [*Richard S. Joseph* of counsel], for the promulgating certificate holders.

FRANKENTHALER, J. Certificate holders of Series N-84 of the New York Title and Mortgage Company have promulgated a plan of reorganization, under the Schackno Act (Laws of 1933, chap. 745, as amd.), which provides (1) for the sale of the property securing the mortgage underlying the issue, and (2) for the designation of a trustee for the issue. The Mortgage Commission has likewise promulgated a plan, under the Mortgage Commission Act (Laws of 1935, chap. 19, as amd.), which calls for (1) the sale of the property on different terms from those specified in the plan proposed by the certificate holders, above referred to, and (2) for the designation of a trustee. Both plans have been submitted to the court for approval.

The property affected by the mortgage consists of a fifteen-story and basement, penthouse, brick elevator apartment on the southeast corner of East Eleventh street and Second avenue. The principal amount of the mortgage, which was originally $650,000, is now $598,000. The mortgage bore interest at the rate of six per cent per annum and matured by its terms on January 26, 1934. Certificates aggregating $593,800 are publicly held, while $4,200 represents the title company's interest in the mortgage. The Mortgage Commission acquired title to the premises, as the result of a foreclosure action, on May 26, 1936. The property had been operated under an assignment of rents since July 10, 1935. The assessment for 1937 is $550,000, while the property was appraised by the Mortgage Commission on January 23, 1937, as being worth $523,000. Arrears of interest from the standpoint of the mortgagor, as of May 1, 1937, after crediting payments of interest aggregating $25,236.56 made to the certificate holders on account of 1934 interest, amounted to $96,969.16, while tax arrears as of the same date were $2,200. The *net* income available for interest received during the year ending March 31, 1937, amounted to $31,695.31, which represents a return of approximately five and three-tenths per cent of the mortgage. An expert appraiser employed by the Mortgage Commission estimates that the net income available for interest during the year ending May 1, 1938, will be approximately $30,800, or five and sixteen one-hundredths per cent of the principal of the mortgage. He also estimates that the average return for the next five years will be $35,000 per year, a return of almost six per cent per annum.

Under the plan promulgated by the Mortgage Commission the property is to be sold for $650,000, of which $52,000 is to be paid in cash (from which, however, a brokerage commission of $10,750 must be deducted, reducing the net cash received to $41,250) and $598,000 by executing a purchase-money first mortgage for five years, bearing interest at the rate of three and one-half per cent per annum during the first year and four per cent during the remaining four years. Amortization payments of one per cent of the principal are to be made during the third, fourth and fifth years. The proposed purchaser has deposited $2,000 to cover the expenses of promulgation and of the proceeding. During the hearings, the offer was modified so as to increase the interest for the first year from three and one-half per cent to four per cent.

Under the plan promulgated by the certificate holders the property is to be sold for $628,000, of which $30,000 is to be paid in cash and the balance by executing a purchase money first mortgage for five years in the sum of $598,000, bearing interest

at the rate of three and one-half per cent during the first year and four per cent during the remaining four years. Amortization payments of one per cent each are to be made during the fourth and fifth years of the mortgage. No brokerage commission is to be paid under this plan.

During the progress of the hearings another offer was received which calls for a price of $641,250, of which $43,250 is to be paid in cash and the rest by executing a purchase-money first mortgage for five years in the sum of $598,000, bearing interest of four per cent per annum with amortization payments of one per cent each during the third, fourth and fifth years of the mortgage. No brokerage commission is to be paid under this plan.

In the court's opinion none of the plans referred to should be approved. The expert appraiser employed by the Mortgage Commission testified that in appraising the property as worth $500,000 he had in mind that at least thirty-five to forty per cent of the price would be paid in cash and that the price which should be obtained for the property ought to be considerably more if the cash amounted to only five or ten per cent, or if the purchase money mortgage called for a low interest rate. Under the best of the offers previously referred to the cash to be received by the seller amounts to $43,250, which is less than seven per cent of the sales price, and about eight per cent of the valuation placed on the property by the Mortgage Commission's expert in January, 1937. In other words, only a very small fraction of the purchase price is payable in cash. Practically the entire price is represented by a mortgage which exceeds, by almost $100,000, the appraised valuation of the property and which calls for no amortization payments during the first two years, and only one per cent for each of the remaining three years. This mortgage, furthermore, would bear interest at the rate of only four per cent per annum, whereas the property has been netting more than five per cent per annum and is expected, according to the Commission's own expert, to do better during the coming five years. What is more, this topheavy mortgage may not be paid according to its terms, and in the absence of a financially responsible obligor the certificate holders may find the property back on their hands. To quote from the testimony of another expert employed by the Mortgage Commission in a different reorganization proceeding recently before the court involving another parcel in which the proposed sale called for a five-year purchase-money mortgage with similar interest and amortization provisions, with a price of $214,000, of which $21,000, or approximately ten per cent, was to be paid in cash: " It is not practical, because at the end of five years they [the certifi-

cate holders] will get the building back, or before the five years is up, in my opinion, they will get the building back in a dilapidated condition, with a changed tenancy, and the amount of cash is not sufficient protection. This expert further testified that the certificate holders in that proceeding would be much safer in selling the property for example, for $160,000 with $60,000 cash, than they would be in selling it for $214,000 with $23,000 in cash.

It is to be noted that the difference between the estimated net income of approximately five and one-half per cent per annum during the next five years and the four per cent interest to be paid under the terms of the purchase money mortgage in the present proceeding amounts, for the five-year period, to seven and one-half per cent of the principal of the mortgage, viz., about $45,000, whereas the net cash to be received under the highest offer above mentioned is only $43,250.

Under these circumstances vigorous dissent to the approval of any of the proposed sales was voiced by various certificate holders. A society owning certificates of this issue has stated that " We feel that the best procedure in the case of this certificated mortgage would be for you to appoint a trustee, and reject both of the proposals for the sale of the property now in hand." Similar views have been expressed by other certificate holders. Attorneys for one certificate holder stated that if a trustee were appointed for the property, " We can probably get better offers than that, and if this property is earning, as has been shown, about five and one-half per cent, and maybe can do better, with the operation of a trustee, the certificate holders will be getting everything they will be entitled to, and can afford to hold out to get a good purchase price for this property." Accordingly said attorneys have asked the court to disapprove the proposed plans except insofar as they call for the appointment of a trustee, pointing out that " The Trustee appointed herein will be able to obtain at the proper time, if desirable, the highest price for the property, as it has been indicated by the bidding in open court that a greater cash price is possible to be obtained."

The views thus expressed are shared by the court. All the offers of purchase are unsatisfactory in that none of them calls for the payment of an adequate amount of cash. Furthermore, the bidding which has already taken place and the earning prospects of the property indicate that more advantageous offers are to be expected if a trustee is appointed with whom persons interested in the property may conduct negotiations for a sale, subject to the court's approval on notice to certificate holders.

Since the above was written, a higher offer has been received from a new source, viz., $647,000, of which $49,000 is to be paid in cash, subject to a deduction of a brokerage commission of only $1,500, and the balance by executing a $598,000 mortgage with the same terms as the others previously mentioned. The net cash to be received is $47,500. The receipt of this offer tends to confirm the expectation that a trustee for the issue will be in a position to obtain even better proposals from the standpoint of the amount to be paid in cash.

For the reasons stated, the plan proposed under the Schackno Act is disapproved, while the plan proposed under the Mortgage Commission Act is approved only in so far as it relates to the appointment of a trustee for the issue. Submit order on notice.